IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| THE COLLEGE OF ST. BENEDICT AND | ) | |
| ST. JOHN'S UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## VERIFIED COMPLAINT

John Doe[1], by and through his attorneys, Peter J. Diessner, Christopher C. Muha and

Justin Dillon, files this complaint for breach of contract; common law negligence; gender-based

discrimination in violation of Title IX of the Education Amendments Act of 1972 (20 U.S.C. §

1681) and the Minnesota Human Rights Act (M.S.A. § 363A.13); and violation of the Americans

with Disabilities Act (42 U.S.C. § 12101 *et seq.*) and the Rehabilitation Act (29 U.S.C. § 701 *et

seq.*). In support of this complaint, John Doe states as follows:

## PARTIES

1.      Plaintiff John Doe is, and at all times relevant to this Complaint has been, a

citizen of the State of Minnesota. Since August 2012, Plaintiff has been an undergraduate

student at St. John's University ("the University"). On May 30, 2014, he was suspended from the

University for two years. Unless that suspension is overturned, it will remain a part of Plaintiff's

---

[1] "John Doe" is not the Plaintiff's real name. Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding in a way that will protect his privacy and that of his accuser, who is identified as "Jane Roe".

educational records for several years and will substantially limit his ability to attend graduate school or secure employment.

2.      Defendant College of St. Benedict (the "College") is a domestic non-profit corporation incorporated in, and with its principal place of business located in, the State of Minnesota.

3.      Defendant St. John's University is a domestic non-profit corporation incorporated in, and with its principal place of business located in, the State of Minnesota.

## JURISDICTION AND VENUE

4.      The jurisdiction of this Court is properly invoked under 28 U.S.C. §§ 1331 and 1367. This is a civil action that arises, in significant part, under the laws of the United States, specifically 20 U.S.C. § 1681 (commonly known as Title IX), 42 U.S.C. § 12101 *et seq.* (the Americans with Disabilities Act), 29 U.S.C. § 701 *et seq.* (the Rehabilitation Act), and 20 U.S.C. § 1092(f) (the Higher Education Act of 1965).  The other claims are so related to the federal claims as to form part of the same case or controversy.

5.      Venue properly lies in this Court under 28 U.S.C. § 1391. The Defendant is incorporated in and has its principal place of business in the State of Minnesota, and the events and omissions giving rise to John Doe's claims occurred within the State of Minnesota.

## STATEMENT OF FACTS

6.      On May 30, 2014, John Doe was suspended by the University based on an erroneous finding that he had violated the Joint Sexual Misconduct Policy for the College of St. Benedict and St. John's University (the "Sexual Misconduct Policy").   The University reached this erroneous result through a negligent process that did not comply with the University's own

procedures, discriminated against Plaintiff based on his gender, and violated his rights under the Americans with Disabilities Act.

## OVERVIEW

7.     Jane Roe's complaint against Plaintiff revolved around three sexual encounters they had between January 18 and January 31.  But their genesis was in a sexual encounter Plaintiff had with G.L., a (now former) friend of Jane Roe's, the semester before.  Jane Roe knew that G.L. and her other friends would not be happy if they learned that Jane Roe was interested in Plaintiff, because G.L. was also interested in Plaintiff.

8.     Soon after Jane Roe first slept with Plaintiff, G.L. and her friends found out the two had slept together.  Jane Roe knew she couldn't be liked by both her friends and by Plaintiff and spent the next two months alternating between trying to win Plaintiff's approval and that of her friends.

9.     Jane Roe tried to win Plaintiff's sympathy by telling him how badly her friends were treating her in the wake of their sexual encounters.  And she tried to win her friends' approval by telling them she had not willingly slept with Plaintiff, but rather that he had raped her.  It was a task made difficult by the fact that Jane Roe and Plaintiff shared a number of mutual friends, and information told to one side was bound to eventually reach the other.

10.     After two months of deceptive and manipulative conduct designed to keep Plaintiff close to her, Plaintiff decided to definitively sever ties with Jane Roe.  When Jane Roe finally realized that there was no chance of winning Plaintiff over, she took the step most likely to restore her status with her friends, and perhaps vent her anger towards Plaintiff, and filed a sexual assault complaint with the University's Life Safety office.

11.     The balancing act she tried to pull off for over two months left a trail of text messages and actions that demonstrably contradict the story she ultimately told. Jane Roe was aware of much of that evidence and did her best to preempt it when she reported the alleged assault. But she was unaware of one critical piece of evidence at the time of her report: an audio recording Plaintiff had made of a conversation they arranged in mid-February so Roe could explain to Plaintiff that, contrary to her friends' assertions, she had not told them that Plaintiff had assaulted her. That recording contradicts all of her central allegations, including whether she consented to their sexual encounters.

12.     The recording fits seamlessly with Jane Roe's statements in text messages to Plaintiff between January and March of 2014; with the testimony of mutual friends of Jane Roe and Plaintiff; and with Jane Roe's repeated attempts, between January and March 2014, to create a romantic relationship with Plaintiff.

13.     This case does not present a simple he said/she said; it rather pits "what she said in April and May" when she filed a sexual assault complaint against (1) what she said in January, February and March, (2) what Plaintiff has consistently said, (3) what their mutual friends have consistently said, and (4) what Roe's actions have consistently said.

**THE UNIVERSITY'S STUDENT PUBLICATIONS**

14.     In August 2012, John Doe matriculated as a freshman at the University. Upon his enrollment, Doe received from the University a number of publications, either in hard copy form or electronically via its website. Those publications included its Sexual Misconduct Policy and its Complaint Procedure for Sexual Misconduct Violations (the "Complaint Procedure," and, collectively with the Sexual Misconduct Policy, the "University Publications"). The Complaint Procedure lists the rights afforded students charged with violations of the Sexual Misconduct

Policy by the University.  It specifically described the procedures by which the University will investigate and adjudicate any alleged violations of the Sexual Misconduct Policy.

15.    In consideration for his tuition and attendance at the University, John Doe received and was given assurances by the University that it would follow and comply with numerous policies and procedures adopted and put forth by the school, including those contained in the University Publications.

16.    The Sexual Misconduct Policy prohibits certain conduct by students at the University, including sexual assault.  Sexual assault is defined as "sexual contact, including but not limited to penetration, without consent."

17.    The Sexual Misconduct Policy defines "consent" as "words or overt actions by a person indicating a freely given present agreement to perform a particular sexual act with the actor."

18.    The Complaint Procedure establishes procedures for the reporting, investigation, and adjudication of allegations of sexual misconduct.

19.    Section VI.A. of the Complaint Procedure states that when the allegations made by a complainant are likely to result in the respondent's suspension or expulsion if found to be true, the complaint will be adjudicated by a three-member hearing committee "comprised of faculty and/or staff" and "appointed by the Dean(s) of Students and/or Lead Title IX Coordinator(s) of the institutions involved."

20.    The Dean(s) and or Coordinator(s) "are responsible for ensuring that committee members have received training" on the Sexual Misconduct Policy and the Complaint Procedures.

21.    That same section of the Complaint Procedure states that, after a committee is chosen, a hearing will commence no fewer than five, and no more than ten, business days from the date that notice of the hearing is given to the parties.

22.    That section also states that, after the hearing is scheduled, parties may make appointments with the Dean(s) of Students to view the file during regular business hours.  But the file "cannot be copied."

23.    Section V.1. of the Complaint Procedure entitles students in disciplinary hearings to the assistance of an advisor.  Advisors must be faculty, administrators, or staff of the University.  Their only designated role is "to assist the complainant or respondent during the course of the proceeding."

24.    Section VI.A. expressly requires the Dean(s) of Students or the Lead Title IX Coordinator(s) of the involved institutions to ensure "that Advisors have been instructed as to their duties."

25.    Section V.4. of the Complaint Procedure, titled, "Interference with Process," expressly forbids anyone from interfering with the investigation or adjudication of a complaint. It states that "[i]nterference includes, but is not limited to . . . [f]alsification, distortion or misrepresentation of information before an investigator, hearing officer or committee."

26.    The Complaint Procedure also provides an appeals process if a student is found in violation by a committee.  The Complaint Procedure "[g]enerally" allows for appeal on three specified grounds for appellate review: (1) the imposition of an excessive sanction; (2) newly discovered evidence that may substantially affect the outcome of a hearing; and (3) the existence of procedural errors that substantially affected the outcome of the hearing.  As the modifier

"generally" suggests, the Complaint Procedure also allows for review of errors that fall outside the three specified categories.

27.     Appeals are decided by "the Vice President(s) for Student Development of the institution(s) of the parties involved in the complaint."

28.     The standard for a successful appeal of a sexual misconduct finding is higher than that for any other type of misconduct finding.  The Complaint Procedure states that the appealing party must show, by a preponderance of the evidence, "that one or more of the above grounds for appeal are satisfied."

29.     The Complaint Procedure for Human Rights Violations, which governs appeals of all other behavioral misconduct findings, does not require appealing parties to establish that one of those grounds is actually satisfied; parties need only establish that their claim to error based on one of those grounds "has merit."

30.     Under the Complaint Procedure, the Deans may not reduce a sexual misconduct sanction even if they find it excessive; rather, they must appoint an appeal committee to independently determine whether the sanction should be reduced.

31.     For all non-sexual misconduct violations, however, the Complaint Procedure for Human Rights Violations gives the Deans the power to reduce sanctions they find to be excessive.

32.     Students are given just three business days to file an appeal.  Students may request an extension of time to appeal, but the grant of an extension and its length rest in the discretion of the Vice President(s) who hear the appeal.

33.    The Complaint Procedure provides no guidance on how appeals are to be resolved when the Vice Presidents of The College of St. Benedict and St. John's University both hear an appeal, but only one believes the appeal has merit.

## THE INCIDENTS

34.    At all times relevant to this Complaint, and still today, Jane Roe was a student at the College, a women-only educational institution run by the Order of St. Benedict.

35.    The College is located approximately six miles from St. John's University.  The two institutions share a close institutional relationship and many, if not all, of the same faculty.

36.    Plaintiff met Jane Roe for the first time on the evening of January 17, 2014, through their mutual friend, A.A.  A.A. is a close friend of Plaintiff and was dating Roe's roommate, M.L., at the time.

37.    Late that night Plaintiff and Jane Roe were at Boni bar, a bar located in the basement of a dorm on the campus of the University, with several of their friends.

38.    Roe was physically forward with Plaintiff at the bar.  A former friend of Roe, L.S., would later recount that, while she and Roe were sitting on a couch on either side of Plaintiff, Roe leaned over Plaintiff to speak with her and placed her hand between Plaintiff's legs while doing so.

39.    Plaintiff and Jane Roe then made out on the couch at the bar.  As 2:15 a.m. approached (the time at which the last bus from St. John's to St. Benedict's leaves), Roe was sitting on Plaintiff's lap.  When Roe's former friends were preparing to leave, one of them approached Roe to say that. Roe pretended not to hear the friend and remained on Plaintiff's lap. The former friend believed that Roe had already decided to try to sleep at Plaintiff's place.

40.     At 2:14 a.m. Roe feigned concern to Plaintiff that she might miss the 2:15 a.m. bus. Plaintiff took her statement at face value and took her outside to help her catch it, but by the time they reached the stop it had already left.

41.     Plaintiff then offered to let Jane Roe sleep on the futon in his dorm room. Jane Roe accepted and they went to his room.

42.     When they arrived, Plaintiff began to get ready for bed. Jane Roe, rather than going to the futon, lay down in Plaintiff's bed. After Plaintiff finished getting ready for bed, he lay down on his bed and faced the wall, with his back to Roe.

43.     Roe then began to massage Plaintiff's back. After some time Plaintiff turned over to face Roe, and he and Roe kissed.

44.     After Plaintiff and Roe had taken off most of their clothes, Roe stopped and told Plaintiff that she had been sexually abused by a high school boyfriend. Plaintiff had never talked to a victim of sexual assault before. After listening to Roe, Plaintiff asked whether Roe wanted to continue, and in particular whether he should still get a condom to put on. Roe answered, "Okay."

45.     Plaintiff got up from the bed and walked across the room to his desk, where he kept his condoms. He put the condom on, and the two had sex. The sex was consensual in every way. At no point did Jane Roe tell Plaintiff to stop or give any indication that she wished to do so.

46.     The next morning, January 18, Roe was anxious to assure her friends she had not slept with Plaintiff. Regarding her whereabouts, she texted a friend at 8:47 a.m.: "just woke up. I missed the bus last night and [Plaintiff] let me sleep on his futon. that's all that happened; he passed out as soon as we got back and he's still asleep."

47.    Later that morning, when Plaintiff woke up, Jane Roe initiated the same series of events that had culminated in sex the night before: She began rubbing Plaintiff's back, which led to kissing, which led to having sex again. That sex, too, was consensual in every way.

48.    Because some of the sex occurred without a condom, Plaintiff and Roe agreed on the morning of January 18 that Plaintiff would get Roe an emergency contraceptive. Plaintiff attempted to deliver it to Roe that afternoon, but Roe seemed in no hurry to obtain it. Plaintiff ultimately delivered it to Roe that evening. Roe did not take it until the next morning, January 19.

49.    On the night of January 18, Roe and Plaintiff hung out together with several of their mutual friends. One of Roe's friends, L.S., recalls that Roe was not afraid of Plaintiff that night, but rather "almost gravitated toward him."

50.    Late the following night, January 19, Roe sent Plaintiff a lighthearted text, recounting how her friends had told her that she and Plaintiff had been "handsy" on the couch at Boni bar two nights before.

51.    Plaintiff and Jane Roe shared two classes together, but had no other significant contact between January 19 and the end of the month.

52.    On Saturday, January 25, Roe exchanged Facebook messages with S.W., a student at another school. Roe came to know S.W. through L.S., who had been close friends with S.W. since high school.

53.    Roe made S.W. promise she would not tell L.S. what Roe was about to tell her. When S.W. agreed, Roe then told her she "accidentally had sex with" a guy whom G.L. had slept with and was still interested in. When S.W. asked, "What's his name?" Roe responded, "[Plaintiff]."

54.     S.W. asked Roe if Roe thought her friends would be upset if they learned she had slept with Plaintiff. Roe's response was unequivocal: "OMG YES. they'd kill me. no one can know."

55.     In a separate exchange of Facebook messages, Roe told S.W. the story of a male student at the University who "was advised to leave the school" his senior year after a student at the College falsely accused him of sexually assaulting her. According to Roe, the reason for the false accusation was the woman's fear that her father would learn she had had sex with the student. Roe stated that the same thing had happened to multiple male students at the University.

56.     Near the end of January, after a night out drinking, Plaintiff went to the dorm room of A.A. and his roommate, D.K., another close friend of his and a mutual friend of Jane Roe.

57.     Unbeknownst to Plaintiff, Jane Roe was there hanging out with D.K. and had planned to spend the night so that A.A. could spend the night in Roe's room with M.L.

58.     When Plaintiff arrived, Roe neither left nor asked Plaintiff to leave. Rather, after the three of them hung out for some time, she came up with the idea that Plaintiff should stay the night with them.

59.     While the three of them were talking, Plaintiff spilled a drink on himself. Roe then removed Plaintiff's pants and hung them up to dry.

60.     Plaintiff agreed to stay the night. After he climbed into A.A.'s bed, Roe climbed into bed with him. The two made out for some time. Roe then asked Plaintiff whether he thought D.K. was asleep yet, and Plaintiff responded he was unsure. Roe then disappeared under the sheets and performed oral sex on Plaintiff.

61.     After that encounter, Roe began to exhibit obsessive behavior with respect to Plaintiff.

62.     Roe became concerned that Plaintiff might be interested in G.L., her friend whom he had previously slept with.  Plaintiff had an application on her smart phone that allowed her to send texts from what appeared to be a false number.  She used that application to send G.L. a text at 12:04 a.m. on February 1, pretending to be a recent acquaintance and asking whether G.L. was on the University's campus, where Plaintiff lived.

63.     Later that same night, Roe used the same false number to send Plaintiff a series of text messages aimed at pushing him away from G.L.: "really, her?  really, her?  lol.  I think she wants the d.  you can do better.  ;)  bad decision hahahahahs.  you looked good before I left."

## JANE ROE'S EFFORTS TO KEEP PLAINTIFF CLOSE AND WIN BACK HER FRIENDS AFTER THEY LEARNED ABOUT THE INCIDENTS

64.     Besides the pseudonymous texts, Plaintiff and Jane Roe had no significant contact between the time of their encounter in D.K.'s room and February 16.  During that time period, however, Roe's friends would learn from a third party that Roe had slept with Plaintiff, and Roe would subsequently accuse Plaintiff of having raped her on January 18.

65.     On or around the first week of February, Roe went to a concert out of state with her College friends.  They were joined by S.W.

66.     Around that time, Roe's friends learned that Roe had slept with Plaintiff.

67.     When Roe's friends confronted her about the fact that she had lied to them and had slept with Plaintiff in January, Roe, for the first time to anyone, accused Plaintiff of having raped her.

68.     Roe's friends did not believe her.  According to Roe, they stated in text messages to each other that they believed they would "catch [her] in a lie" regarding that allegation.

69.     On February 15, G.L. told Plaintiff that Roe had accused him of rape.  On February 16, at Plaintiff's request, G.L. memorialized Roe's accusation in a text message to Plaintiff.  She stated that Roe had told her she just wanted to sleep on the night of January 17, that Plaintiff started making out with her, that Roe said she did not want to have sex, and that Plaintiff "didn't take that for an answer."

70.     On February 16, Plaintiff texted Jane Roe, asking for an explanation of the allegation.  Roe responded that she wanted to "talk in person."

71.     Once Jane Roe discovered that Plaintiff had learned of her allegation of rape, she went to great lengths to avoid being present with both Plaintiff and her female friends at the same time.  To maintain her story with her friends, she knew she would have to appear disinterested in, or even hostile to, Plaintiff in their presence.  But if there was any hope of convincing Plaintiff to enter a relationship with her, she knew she could not act that way towards him.  Therefore, on the multiple occasions in February and March when she sought to spend time with Plaintiff, she would typically insist that they do so alone.

72.     The first such instance occurred on February 16, when Plaintiff and Jane Roe discussed meeting to talk about her allegations of rape.  Plaintiff insisted that they do so in the presence of M.L. (Roe's friend and roommate) and A.A. (their mutual friend and M.L.'s boyfriend).  Plaintiff was afraid to risk the chance that she would raise additional false accusations if there were no witnesses to confirm what took place.

73.     Despite claiming that Plaintiff had assaulted her twice, Jane Roe was just as insistent that they meet alone, either in Plaintiff's room—the very place the alleged attacks occurred—or in her own dorm room.

74.    When it became clear Roe would not discuss her allegation of rape in front of witnesses (despite the fact that both already knew she had accused Plaintiff of rape), Plaintiff agreed as a compromise to meet Roe alone in A.A.'s dorm room, at a time when A.A. and M.L. would know they were meeting.

75.    To further protect himself, and unbeknownst to Roe, Plaintiff made an audio recording of that meeting.

76.    When Plaintiff and Roe sat down to talk on February 18, it immediately became clear why Roe had refused to discuss the rape allegation in front of witnesses, and M.L. in particular. Before Roe even answered Plaintiff's first question, she asked him to move closer to her: "Yeah, can you come over here?  You feel kind of distant from me."

77.    Roe then denied telling G.L. and her other friends that Plaintiff had raped her. She said what happened between them was not assault but was a failure on her part to communicate a desire not to have sex.  In a text before the meeting she characterized the alleged assault as "a miscommunication," and at the meeting as "kind of an accident" that "wasn't a big deal."  She stated Plaintiff had not "intentionally violated [her]," that the miscommunication was "[her] fault," that she took "complete complete [sic] responsibility" and that she was "not mad at [Plaintiff] at all."

78.    Roe confirmed every significant aspect of Plaintiff's version of what took place that night, which contradicted her text to her friends at 8:47 a.m. the next morning.

79.    Roe acknowledged that, when they were at Boni bar the night of January 17, Plaintiff tried to help her catch the bus back to St. Benedict.

80.    Roe acknowledged that, when she missed the bus, Plaintiff specifically offered that she could sleep on his "futon."

81.     Roe acknowledged that while Plaintiff was brushing his teeth, she instead laid down on his bed.

82.     Roe acknowledged that Plaintiff got into the bed, laid with his back to Plaintiff, and tried to go to sleep.

83.     Roe acknowledged that she was responsible for initiating physical intimacy by beginning to rub Plaintiff's back ("it's a . . . it's a thing I do").

84.     Roe also acknowledged that she consented to having sex even though on some level she preferred not to.  In her words, she had sex with Plaintiff because she "turned into the people-pleasing version of [her]self."  She never explained how Plaintiff could have known that, despite her agreement to have sex, she actually preferred not to.

85.     Roe also confirmed that she was responsible for the lack of communication of her preference.  She acknowledged that, after telling Plaintiff about her abusive past, Plaintiff asked whether she still wanted to have sex.  Roe admits she did not say no, but rather simply never said yes.  To quote her exactly, "I guess I never really . . . I saw the absence of an answer as more being . . . I, I know I didn't overtly say yes and that's my fault."  She acknowledged that "[she] wasn't afraid of saying no," but chose not to in order to please Plaintiff.  (Plaintiff: "Why didn't you [say no]?"  Roe: "I turned into the people-pleasing version of myself.").

86.     Roe also admitted that when Plaintiff then asked her whether he should still get a condom, she said, "Okay."  This was consistent with her desire not to have sex, she said, because in her abusive relationship she asked her ex to go get things as a way to take his mind off sex.  Roe never explained why she thought saying "okay" to getting a condom, as opposed to getting something not sex-related, would take Plaintiff's mind off sex.

87.     Roe, in any event, agreed that Plaintiff had no reason to know her intent in saying "okay" was supposedly to avoid sex.  She summed up her responsibility in stark terms that took Plaintiff aback: "You didn't rape me, I raped myself."

88.     Roe did not dispute Plaintiff's statement that the condom was located across the room from where they had been making out and that Plaintiff had to walk across the room to get it.

89.     Roe did not attempt to claim that their sex the following morning was the result of "miscommunication."  In response to the question, "[W]hy the next morning . . . did you consent to having sex again?" she responded that since they had already had sex, she "turned off caring" about her preference not to have sex.

90.     In the recording, Roe blamed her friends, and G.L. in particular, for deliberately twisting her words to make it seem like she was accusing Plaintiff of rape.  Her friends, she said, have "been really pushing me really far away, like, since last semester and this semester it's really just been like constant talking shit about me and I don't really know why."  Roe asserted that G.L. "had feelings for [Plaintiff] and spread the "rape" allegation out of jealousy: "I know [G.L.]'s really jealous of me in general because we both have similar talents . . . and I think the idea that she thought that you would move from her to me  . . . she saw that it was really offensive."

91.     Roe later confirmed, in a text sent the following month, that what upset her about the incident was not anything Plaintiff had allegedly done to her, but rather what her friends had allegedly turned it into: "[M]y anger from our encounter was toward my friends who left me in a situation neither you nor I anticipated."

92.     Roe also went on, at great length, about other ways in which her friends had recently been mean to her.  She did so in attempt to generate sympathy from Plaintiff and draw him close to her.

93.     Near the end of the recording, Roe joked with Plaintiff about feeling bad for D.K. on the night she performed oral sex on Plaintiff in D.K.'s dorm room while they were unsure whether D.K. was asleep.

94.     On the night of February 18, after their talk had concluded, Jane Roe texted Plaintiff to apologize for the anxiety her allegation of rape had caused him:  "I can't apologize enough for any pain you endured when you were scared about your future."

95.     Plaintiff determined after that talk to create some distance himself between himself and Jane Roe.  The two did not text until four days after the talk, when Jane Roe texted him at 2:08 a.m. asking him to go hang out with her and D.K.  Plaintiff had no intention of letting anything remotely sexual happen again and did not respond to that request.

96.     Plaintiff and Roe did not text again until March 11, when Plaintiff asked Roe some questions about a lab assignment.

97.     Three days later, on March 14, Roe asked if she could visit Plaintiff's dorm room to give him a Political Science study guide.  Plaintiff chose not to respond to that offer.

98.     The following night, March 15, at 1:24 a.m., Roe texted again to ask if Plaintiff wanted to smoke with her.  She also said she "might need a place to sleep" that night, in the hopes that she could stay with Plaintiff.  Plaintiff's curt response, "Bus at 2:15," signaled clearly that he was not interested in any kind of romantic interaction with her, even when offered.

99.     Roe realized then that only extraordinary circumstances could bring them together romantically.  So she concocted an extraordinary plan.  Almost immediately after Plaintiff's

17

rejection of her advances, she began telling his friends that she had something she needed to speak with him about.

100.    On March 18, after hearing that Roe wanted to speak with him, Plaintiff texted her and told her so. But Roe responded that it wasn't urgent. She then randomly stated that the only reason she asked to spend the night with him on March 15 was because a mutual friend of theirs, N.M., wanted her to stay with him. She next stated that she didn't want to tell him the topic she needed to talk about until they spoke in person.

101.    Plaintiff refused to offer a time or place in which to meet Roe. The following day they exchanged some texts, but only about class.

102.    Friday night, March 21, was the next time Roe texted about getting together to talk. As in her March 18 texts, there was no indication of urgency. Plaintiff did not want to see Roe over the weekend, let alone on a Friday night, and so did not respond.

103.    At 10:37 p.m. on Sunday night, March 23, Jane Roe texted Plaintiff and again asked to talk. Perhaps sensing Plaintiff's apprehension about her motives, she reassured him that this was not part of an attempt to bring them close: "don't worry, I'm not going to profess my undying love for you or anything crazy ;)".

104.    Plaintiff waited until the following afternoon to respond. Plaintiff and Roe agreed to talk the following day, Tuesday, March 25. But they could not agree on a location: Jane Roe insisted on meeting either in her dorm room or in his, while Plaintiff insisted they meet in the room of A.A. and D.K., as they had on February 18.

105.    Jane Roe then asked if A.A. had told Plaintiff the topic of the long-awaited conversation. Plaintiff did not respond. A.A. had in fact told him the topic Roe wanted to

discuss: an alleged miscarriage she had suffered on February 7, three weeks after they slept together.

106.    Roe would later state that she was positive she suffered a miscarriage on that date because her period was late and was more painful than normal.  Yet Roe took the emergency contraceptive "Plan B" within 36 hours of having sex with Plaintiff (it is 95% effective when taken within 24 hours of sex and 89% effective when taken within 72 hours), and would have conceived only three weeks prior, making it very difficult to determine whether she miscarried or simply had a painful late period.

107.    Tellingly, Roe did not speak about the alleged miscarriage to anyone until just after Plaintiff rejected her requests to visit him at, or spend the night in, his room.

108.    On the morning of March 25, Plaintiff and Roe exchanged a lengthy series of text messages, consisting largely in Plaintiff's insistence that they talk in A.A.'s room as planned, and Roe's attempts to move the talk to her room by playing on Plaintiff's sympathies one last time.

109.    The exchange started when Jane Roe texted at 9:36 a.m. stating that she assumed Plaintiff's non-response the night before meant A.A. had told him the topic of the long-awaited conversation.  Roe stated that they therefore had no need to meet anymore.

110.    When approximately three hours went by without a response from Plaintiff, Roe texted again, stating that she knew A.A. had revealed her supposed miscarriage and that she now wished to talk.  But she insisted she could now only talk in her room because her "social life is a complete mess right now and I do not feel comfortable outside my own room because of the hostile environment that has been surrounding me lately."  She did not explain why she was

willing to brave this environment the night before when they initially scheduled the talk, but not that morning.

111.    Plaintiff told Roe he was only willing to speak in A.A.'s room.  When Roe refused, Plaintiff said they would not be talking that night.  Roe responded by stating, "I don't have the support system you have to get you through this.  I don't have anyone."  Plaintiff suggested she seek counseling, and Roe responded that she's seen a counselor since she was a kid.  The difference she said, was that Plaintiff, unlike her, "ha[s] friends to talk to, people to confide in."

112.    Plaintiff saw no connection between Roe's lack of friends and her unwillingness to leave her dorm room, and, in any event, was unwilling to risk a meeting there.  He refused to give in.  Roe restated her supposed fear of entering a "hostile environment" but, realizing she would not get her way, finally agreed to meet Plaintiff in A.A.'s room "out of respect for" Plaintiff.

113.    That last text was sent at 1:26 p.m.  Around that time, Plaintiff and A.A. got into an argument.  He had been trying to mediate this logistical dispute between Roe and Plaintiff because his girlfriend, M.L., was Roe's roommate.  Plaintiff became upset at the thought that Jane Roe might cost him a close friendship.  At 2:52 p.m. he texted her in anger, "I swear to god if you ruin me and [A.A.]'s friendship over this… Leave him out of this."  Roe responded that this "hurt [her] and scared [her]" and insisted she is not the kind of person who would drive us apart.

114.    Immediately after claiming Plaintiff's angry text scared her, Roe offered never to talk to Plaintiff or A.A. again "if you want."  Plaintiff said he couldn't speak for A.A., "but that's what I want" after that night's planned talk.

115.    Over the course of several more texts, Roe used Plaintiff's desire for one last talk to try to keep him from cutting her out of his life. "[I]f you never want to talk to me again," she said, "there is absolutely no point in talking" that night. "I'm unable to talk tonight," she stated after Plaintiff insisted they meet, but "when the weather is good, maybe we can go out to watab or by the lake to talk." "I think we need some time to process so I will be less sad and you less angry."

116.    Roe also tried to use guilt and sympathy to achieve the same end. "I am afraid because I don't [want] either of us to feel this alone," she said in one text. "It feels very personal that you want to remove me from your life," she said in another. And in yet another, "it makes no sense to ignore the one person who may be able to slightly comprehend what you're going through."

117.    Finally, when the next six texts made clear that Plaintiff's mind had not changed, Roe swung for the fences, so to speak: "[T]he honest truth is that the real reason I want to get to know you is to try and grasp what our child would have been like." Plaintiff was not swayed.

118.    In the most telling moment of the exchange, Roe echoed what she had told Plaintiff on February 18, lamenting, "[S]o far I've done what you wanted, since the day we got together. I've tried so hard to please other people my whole life and that includes you." Plaintiff responded that all he has wanted is for Roe to leave him alone, and asked whether she was still willing to have their last talk at 7:30 p.m. that night."

119.    Roe answered that Plaintiff's response was "rude, unnecessary, and contrary to the fact that [Plaintiff] instigated sexual intercourse between us." "Instigate" simply means "to initiate," but it can also have a negative connotation. So Plaintiff replied by clarifying that he wanted her to leave him alone only *after* the rape allegation. Roe responded that she "never

accused you of that" and once again blamed her former friends: "The idea that someone tries to turn you and everyone I know against me, using that is disgusting."

120.    Roe clarified further that Plaintiff's fault lay not in assaulting her, but in hurting her feelings: "If I didn't fully clarify the night we talked, I felt used and hurt but my anger from our encounter was toward my friends who left me in a situation neither you nor I anticipated."

121.    Roe then wished Plaintiff well.  Plaintiff returned the sentiment, and the texts ended.

122.    In the week following those texts, Plaintiff drew a clean break with Roe.  He unfriended her on Facebook and blocked her on Twitter.  She would have known about both actions.  They had no further interaction before April 24, when Plaintiff was notified of Roe's allegations.

### THE INCIDENTS ARE REPORTED AND INVESTIGATED

123.    On or before April 24, Roe filed a sexual assault complaint with the Life Safety Office.

124.    On April 24, Roe met with Shawn Vierzba, the head of the Life Safety office, and gave a victim impact statement.

125.    At the time she gave that statement, Roe was unaware that Plaintiff had recorded their conversation on February 18.  She made several statements to Mr. Vierzba that contradict what she told Plaintiff on February 18, including lies about what she actually said to Plaintiff on February 18.

126.    Roe also made a number of statements to Mr. Vierzba that were too incredible to believe and that should have caused Mr. Vierzba to doubt her credibility.

127.    Roe's lies, distortions and mischaracterizations interfered with Mr. Vierzba's investigative process from its inception.

128.    The recording of the February 18 conversation was provided to Mr. Vierzba as part of the investigative process.  Mr. Vierzba could have confirmed that Roe had lied to him about what she told Plaintiff on February 18, and further that Roe's version of events directly contradicted what she told Plaintiff on that date.

129.    Roe's lies and distortions started at the very beginning of the story.  She told Mr. Vierzba that on that first night at Boni bar, after her friends told her they were leaving, she "started preparing myself to say goodbye and whatever and the next thing I knew, all the girls were gone and they left me behind."  Roe made no mention of the fact that Plaintiff attempted to help her catch the last bus, and her version contradicts the version of her then-friend, L.S., who recalls that Roe pretended not to hear that they were leaving and made no attempts to get off Plaintiff's lap.

130.    Roe then told Mr. Vierzba that they began making out in Plaintiff's room and that she took off her belt because "I don't like wearing belts."

131.    Roe then stated that after they made out a bit, she stopped and told Plaintiff about her abusive past.  When she was done recounting it for him, Plaintiff got a condom "[f]rom underneath the mattress" they were on and had sex with her.  That statement directly contradicted her acknowledgement on February 18 that Plaintiff had to get up and walk across the room to get the condom.

132.    Roe also told Mr. Vierzba that she told Plaintiff "no."  That statement directly contradicts what she told Plaintiff on February 18, when she admitted she never said "no" but,

rather, never said the word "yes," and did say the word "okay" when Plaintiff asked whether he should get a condom.

133.     Roe's version of events to Mr. Vierzba, then, was that, rather than just have force her to have sex while they were making out, he stopped, let her recount her history of abuse, waited for her to finish, got up and put a condom on, and only then had nonconsensual sex with her.

134.     Roe also told Mr. Vierzba that, on February 18, Plaintiff blamed the alleged assault that night on the fact that he was drunk.  The recording of their conversation that day contains absolutely no mention of this.

135.     Roe told Mr. Vierzba that, the next morning, she told her friends that she and Plaintiff "made out" in his room and then "went to sleep." Her text message to L.S. at 8:47 a.m. that morning, however, stated that when they returned to Plaintiff's room, he immediately passed out.

136.     Despite claiming that Plaintiff had assaulted her the night before, Roe admitted to Mr. Vierzba that the next morning, she initiated physical contact with Plaintiff by giving him a back massage.

137.     Roe also admitted that she is the one who began kissing Plaintiff that morning. Her reason for doing so, she said, was "to get him to shut up" because he was talking about himself and she "really wasn't liking his personality at that point."

138.     Roe stated that she then allowed Plaintiff to lay on top of her and give her a back massage, even though she had no pants on, because "[c]ool, everyone wants a back massage."

139.    Roe then stated that "all of the sudden" she felt Plaintiff's penis between her legs and he entered her.  When asked, "Was your underwear still on?" she responded, "He must've taken them off" but couldn't remember when or how they came off.

140.    Roe told Mr. Vierzba that on February 18, Plaintiff blamed their sexual encounter that morning on the fact that he "definitely still was drunk" from the night before.  But the recording contains absolutely no mention of this.  On the contrary, Roe agrees in that recording that both of them were "completely sober" that morning and that the sex was consensual.

141.    Roe also lied about the night she performed oral sex on Plaintiff in D.K.'s room. She told Mr. Vierzba that she was not happy he stayed the night there.  D.K., however, told Mr. Vierzba that it was Roe's idea that Plaintiff stay the night, and that she was "excited" about it.

142.    Roe also told Mr. Vierzba that she slept in the same bed as Plaintiff because he passed out there and she "was not about to sleep on the floor."  Mr. Vierzba did not ask her why she would rather sleep in a bed with her alleged two-time rapist than on the floor.

143.    D.K. also told Mr. Vierzba that he and A.A. "were aware of all [Roe's] psychological issues and what not" but did not warn Plaintiff of that until "afterwards."

144.    Roe told Mr. Vierzba that the angry text Plaintiff sent her on March 25 regarding his friendship with A.A. "scared me and that way I couldn't meet with him and haven't been one on one ever since."  But her subsequent texts that day show that the real reason she refused to meet Plaintiff was because she "fear[ed it] would turn into us both saying hurtful things to one another that can't be taken back," and that she in fact hoped the two of them would meet one on one in the near future: "[W]hen the weather is good, maybe we can go out to watab or by the lake and talk".

145.     Special accommodations were made to help Roe prepare for the hearing, violations that risked the security and privacy of Plaintiff's confidential information. Specifically, Roe was allowed to view the case file remotely in Fargo, at the law offices of the university's attorneys.  Plaintiff had been told that he would be allowed to view the case file remotely only if both of them so agreed, and if they signed an actual waiver.  Plaintiff's father was a party to the conversation in which Plaintiff was told this. Plaintiff expressly did not agree, being unwilling, among other things, to risk that the file's contents could be leaked.  Yet it was disclosed to Plaintiff just minutes before the hearing that Roe had been permitted to remotely review the case file despite the fact Plaintiff had not agreed or signed a waiver.  Not only was her review improper, but its disclosure could not have come at a worse time.  It threw Plaintiff off immediately before the hearing and led him to question whether there was a more general bias against him, and in favor of Roe, in the investigative and hearing process.

## THE HEARING

146.     Despite the obvious lies and incredible statements that formed the basis of Roe's complaint, Plaintiff was informed by letter on Wednesday, May 14, that Roe's complaint would proceed to a committee hearing on May 27 or 28.

147.     Plaintiff was in the midst of final exams when he received the letter.  He took his last exam on Friday, May 16.

148.     Commencements for The College of St. Benedict and St. John's University took place on May 17 and 18, respectively.  Most students, and therefore most potential witnesses, would not be on campus when the hearing occurred.

149.     The May 14 letter told Plaintiff he would not be permitted to review the investigation file until May 20.  It also stated that "any written documentation to be presented" at

the hearing, "the names of any witnesses . . . and a summary of the factual information such witnesses may provide" had to be submitted to the Dean(s) of Students by May 22.

150.   Plaintiff therefore had just three days—May 20, 21 and 22—to prepare written documentation for presentation at the hearing, contact potential witnesses, confirm their ability to appear at a hearing, and produce written summaries of their testimony after reviewing the investigation file.

151.   Earlier that academic year, Plaintiff had been labeled a "Student at Risk" because of psychological issues, including severe depression, he suffered in coping with a serious spinal disease he had recently contracted.

152.   The disease would make his spine progressively more arthritic in the months and years ahead.  Already, the pain it caused made it impossible for him to continue playing football, and in the longer term it would mean subjecting himself to dangerous and potentially life-threatening treatments.

153.   Plaintiff met with Tom Sagerhorn, the University's Disability Specialist, to discuss the severe depression he was suffering in coping with this new reality.

154.   That academic year, Plaintiff was provided with various disability accommodations by the University in order to cope with the limitations he experienced due to his depression.  The last of these was provided as recently as this past March.

155.   Upon information and belief, Plaintiff was formally registered with the University as disabled.

156.   Before his hearing, Plaintiff's parents met with the University's Dean of Students, Michael Connolly, to discuss how Plaintiff's disability could impact his hearing.  Plaintiff's parents noted the difficulties Plaintiff had experienced that year in coping with his depression

and asked whether he could be assisted by an attorney at his hearing. They were told he could not be.

157.    Despite being labeled a "Student at Risk" and disabled, Plaintiff was never offered an alternative accommodation for his disability at the hearing.

158.    Instead, a special accommodation was made for Roe, one that risked the security and privacy of Plaintiff's confidential information. Roe was allowed to view the investigative file remotely in her hometown of Fargo, North Dakota, at the law offices of the University's attorneys, rather than travel to campus. Plaintiff was expressly told that this deviation from normal procedure would be allowed only if both he and Roe agreed and both signed a waiver. Plaintiff expressly did not agree, being unwilling, among other things, to risk that the file's contents be leaked.

159.    It was disclosed to Plaintiff just minutes before the hearing that Roe had been permitted to remotely review the case file despite the fact that he had not agreed or signed a waiver. Its disclosure immediately before the hearing caused him to question whether there was a more general bias against him, and in favor of Roe, in the investigative and hearing process, and confused and disoriented him at a time he needed to be focused on his and Roe's testimony.

160.    Had Plaintiff known this rule would be broken for Roe, he too would have chosen to view the file remotely since, with his privacy already compromised, he could at least prepare for the hearing on an equal footing with Roe.

161.    At the hearing, Roe testified largely the same as she did to Mr. Vierzba when she gave her victim impact statement.

162.    Plaintiff's advisor, Joe Prostrollo, appeared at times to be acting as an advocate for the administration. As a campus floor advisor, Mr. Postrollo depended on the University for

employment and housing. Plaintiff chose Mr. Postrollo as his advisor because he was told he had to choose a faculty member.

163. Mr. Postrollo had never served as an advisor in a sexual misconduct disciplinary proceeding before agreeing to do so for Plaintiff.

164. At the hearing, Mr. Postrollo made statements that would have been strange coming from any trained advisor, but which were particularly strange given his background in journalism. Specifically, he (1) encouraged Plaintiff not to take notes on Jane Roe's last round of testimony because Plaintiff had the hearing in the bag; (2) suggested Plaintiff destroy all of his evidence after the hearing; and (3) asked if Plaintiff would sue the University if he lost.

165. By suggesting that Plaintiff destroy all of his evidence after the hearing, and asking whether he would sue if he lost at the hearing, Mr. Postrollo showed he was unaware that Plaintiff had a right to appeal a negative hearing decision.

166. On May 30, the committee found Plaintiff guilty of sexual misconduct. It concluded that Roe "did not give consent to sexual intercourse." It based that conclusion on a single finding—that Roe supposedly "indicated . . . that she did not want to engage in sexual intercourse" with Plaintiff.

167. The committee imposed a two-year suspension upon Plaintiff and conditioned his readmission on visiting a counselor, completing an alcohol and drug assessment, and having no contact with Roe while suspended.

168. Mr. Postrollo had previously told Plaintiff that both Mr. Vierzba (who investigated the case) and Dean Michael Connolly (who conducted the hearing) expressed to him that they thought Plaintiff was innocent. When Plaintiff learned he had been found guilty, he

texted Mr. Postrollo in exasperation, asking why he had lost when those men believed he was innocent.  Mr. Postrollo never responded to that text.

## THE APPEAL

169.    Plaintiff filed a detailed appeal of the hearing committee's decision on June 9, 2014.  He submitted an amended appeal on June 10 that added a single word mistakenly left out of the original.  The substance of the two appeals was the same.

170.    Plaintiff challenged the hearing board's decision on three grounds: (1) that the committee's decision was without basis and substantively wrong; (2) that it was the result of procedural error; and (3) that his sanction was excessive.

171.    Regarding the first ground of error, Plaintiff argued that Roe's recorded statement; her text messages; her repeated efforts to be alone with Plaintiff, including in the room the alleged assaults took place; and the testimony and text messages of their mutual friends all indicated that they had only consensual sex.

172.    Regarding the second ground of error, Plaintiff noted four procedural irregularities that demanded a new trial:  (1) Roe interfered with the investigative and hearing process by making false and misleading statements to Mr. Vierzba; (2) the committee applied the wrong definition of "consent" by concluding that consent consisted of a preference to do something rather than an agreement to do something; (3) the University failed to treat the parties equitably when it allowed Roe to view the investigative file remotely; and (4) Plaintiff's advisor showed signs of bias and tampering.

173.    Regarding the third ground of error, Plaintiff argued that a two-year suspension was excessive because Roe's overt acts and at least some of her words (such as her "okay" regarding the condom) indicated consent, and because Roe's attempts to be close to Plaintiff in

February and March proved she did not fear for her safety around Plaintiff. Plaintiff also noted that a two-year suspension would have serious repercussions on his future.

174.    In a letter dated June 18, 2014, the Vice Presidents of the University and the College of St. Benedict, Fr. Douglas Mullin and Mary Geller, respectively, denied Plaintiff's amended appeal.

175.    In a separate letter dated June 12, but sent on June 18, Fr. Mullin also provided "an additional more detailed explanation than we normally provide in circumstances where we have determined that grounds for an appeal do not exist."

176.    That explanation dodged all of the central arguments Plaintiff raised in his appeal.

177.    Fr. Mullin first stated that he "d[id] not agree with [Plaintiff's] interpretation" that appeals could be had based on substantive error, but then admitted that it was merely University "policy" to allow for appeal only on the three specified grounds. He then conceded that the word "generally" "leaves room for deviation from th[at] standard policy" but refused to deviate from that policy.

178.    Fr. Mullin dismissed Plaintiff's claim for interference with process on the ground that Plaintiff simply "d[id] not agree with either Complainant's version of events or what the Hearing Committee ultimately determined." Fr. Mullin refused to acknowledge that Roe provably lied to Mr. Vierzba about what she told Plaintiff on February 18, as evidenced by the recording of their conversation on that date.

179.    Fr. Mullin also refused to acknowledge that the committee's findings failed to support its conclusion that there was nonconsensual sex. He concluded only that, in his view, the evidence in the record was sufficient "to support a more likely than not finding that" nonconsensual sex occurred. He ignored the fact that, whatever his own view of the evidence,

the committee only made one relevant finding—that Roe allegedly did not "want" to have sex—and concluded from *that finding* that the sex was nonconsensual.

180.  Fr. Mullin also ignored entirely the fact that the University conditioned the remote viewing of the investigative file on the express written waiver of both parties.  He said simply that he believed it was fair to let Roe view the file remotely, and that, even though the Complaint Procedure allows for hearings to be delayed for reasons like this, the University did not want to do so.

181.  Regarding the potential tampering by Plaintiff's advisor, Fr. Mullin stated simply that Plaintiff got to choose his advisor and that the advisor's inadequacies did not seem to affect the hearing.  He refused to confirm that no tampering had taken place or to address Plaintiff's real concern that tampering suggested a larger bias against him.

182.  Finally, Fr. Mullin stated that he believed the sanction was not excessive.  But he refused to explain why he believed so in the context of the specific facts of Plaintiff's case.  In particular, he ignored entirely the fact that Roe suffered no fear whatsoever for her safety and that she exhibited several incontrovertible signs of consent.

183.  Fr. Mullin concluded the letter by stating that the decision was final and not further appealable.

## COUNT I – BREACH OF PROMISED DISCIPLINARY PROCEDURES

184.  Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

185.  At all times relevant hereto, a contractual relationship existed between St. John's University and Plaintiff. The University's Handbook was a part of that contract. Under that contract, the University was required to act in accordance with its Handbook in resolving

complaints of violations of the Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals challenging a disciplinary panel's determination.

186. The University breached this contract with Plaintiff by failing to comply with the Handbook in at least the following ways:

    a. Failing to find Plaintiff guilty only if a preponderance of the evidence showed him to be, in violation of Section V. of the Complaint Procedure;

    b. Failing to provide Plaintiff an investigation and hearing free of interference, and failing to remedy such interference, in violation of Section V.4. of the Complaint Procedure.

    c. Failing to apply the definition of "consent" provided in Section I.C. of the Sexual Misconduct Policy, and implying instead a definition of "consent" not found in the University's publications.

    d. Failing to provide fair and equitable treatment of the parties during the investigation and hearing, in violation of Section III of the Sexual Misconduct Policy.

    e. Failing to provide Plaintiff an impartial and unbiased advisor to assist him at his hearing, in violation of Section V.1. of the Complaint Procedure.

    f. Failing to provide Plaintiff a new hearing if he made a 50.1% showing of error on appeal, in violation of Section VI.A. of the Complaint Procedure.

187. As a direct and proximate result of the University's breach, Plaintiff has been seriously and irreparably damaged in the following ways, among others: (1) the time Plaintiff spent participating in the investigation and preparing for his hearing left him less time to study

for final examinations and complete his remaining degree requirements, resulting in lower final grades, increased difficulty being admitted to graduate school, and a corresponding loss in earning potential; (2) the disciplinary records now contained in Plaintiff's educational file as a result of this make it difficult, if not impossible, for Plaintiff currently to obtain certain types of employment or be admitted to certain schools at which he would otherwise be competitive, requiring that he either settle now for inferior options or wait until his file is purged of this erroneous result; (3) Plaintiff will experience a lifetime reduction in earning potential based on the inferior career prospects that will be available to him due to the fact that this disciplinary violation will make him less competitive at top graduate schools and preferred employers; and (4) Plaintiff will experience emotional suffering and embarrassment from having to explain to future employers and graduate schools, for at least the next several years, why his file contains records indicating that he was found responsible for sexual misconduct.

188.   For all of these reasons, the University is liable to Plaintiff for breach of contract and all damages arising out of that breach.

## COUNT II – BREACH OF CONTRACT

189.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

190.   At all times relevant hereto, a contractual relationship existed between St. John's University and Plaintiff. The University's Handbook was a part of that contract. Under that contract, the University was required to act in accordance with its Handbook in resolving complaints of violations of the Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals challenging a disciplinary panel's determination.

191.    The University breached these promises to Plaintiff by failing to comply with the

Handbook in at least the following ways:

   a.  Failing to find Plaintiff guilty only if a preponderance of the evidence showed

       him to be, in violation of Section V. of the Complaint Procedure;

   b.  Failing to provide Plaintiff an investigation and hearing free of interference, and

       failing to remedy such interference, in violation of Section V.4. of the Complaint

       Procedure.

   c.  Failing to apply the definition of "consent" provided in Section I.C. of the Sexual

       Misconduct Policy, and implying instead a definition of "consent" not found in

       the University's publications.

   d.  Failing to provide fair and equitable treatment of the parties during the

       investigation and hearing, in violation of Section III of the Sexual Misconduct

       Policy.

   e.  Failing to provide Plaintiff an impartial and unbiased advisor to assist him at his

       hearing, in violation of Section V.1. of the Complaint Procedure.

   f.  Failing to administer a sanction that was not excessive.

   g.  Failing to provide Plaintiff a new hearing if he made a 50.1% showing of error on

       appeal, in violation of Section VI.A. of the Complaint Procedure.

192.    As a direct and proximate result of the University's failures, Plaintiff has been

seriously and irreparably damaged in the following ways, among others: (1) the disciplinary

records now contained in Plaintiff's educational file as a result of this make it difficult, if not

impossible, for Plaintiff currently to obtain certain types of employment or be admitted to certain

schools at which he would otherwise be competitive, requiring that he either settle now for

inferior options or wait until his file is purged of this erroneous result; (2) Plaintiff will experience a lifetime reduction in earning potential based on the inferior career prospects that will be available to him due to the fact that this disciplinary violation will make him less competitive at top graduate schools and preferred employers; and (3) Plaintiff will experience emotional suffering and embarrassment from having to explain to future employers and graduate schools, for at least the next several years, (a) why he has two-year gap in his university attendance, and (b) why his educational file contains records indicating he was found responsible for sexual misconduct.

193.    For all of these reasons, the University is liable to Plaintiff for breaching the disciplinary procedures promised to Plaintiff, and all damages arising out of that breach.

## COUNT III – NEGLIGENCE

194.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

195.    In its interactions with Plaintiff, in its adoption and implementation of the Handbook, and in conducting its investigation and adjudication of Jane Roe's complaint, St. John's University owed a duty to Plaintiff to exercise reasonable care, with due regard for the truth, established procedures, and the important and irreversible consequences of its actions, in addition to Plaintiff's various liberty and property rights and interests generally.

196.    At all times relevant to this Complaint, Shawn Vierzba was the head of the University's Life Safety office.

197.    Mr. Vierzba investigated Jane Roe's complaint on behalf of the University.

198.    Mr. Vierzba failed to challenge Roe on the obviously incredible elements of her victim impact statement, including her statements that she took off her belt because she doesn't

like belts, kissed Plaintiff the following morning to make him stop talking, and couldn't explain how her underwear came off that morning.

199.    After obtaining the recording of Plaintiff's conversation with Roe on February 18, Mr. Vierzba failed to verify whether Roe's statements therein were consistent with what she testified to in her victim impact statement, and/or failed to confront Roe about any inconsistencies or discuss them with any other administrator or staff member involved in the investigation or adjudication of Roe's complaint.

200.    Mr. Vierzba's negligent or intentional failure to remedy Roe's interference with his investigative process directly and foreseeably caused harm to Plaintiff by subjecting him to a committee hearing tainted by that interference.

201.    The Complaint Procedure gives students the right to select an advisor to assist them at disciplinary hearings.

202.    The Complaint Procedure requires that such advisors be employees of the University.

203.    The Complaint Procedure also obligates the Dean(s) of Students to ensure that advisors receive adequate training to perform their duties.

204.    Plaintiff selected Joe Postrollo, a floor advisor in his freshman dorm, as his advisor.

205.    Joe Postrollo was an employee of the University at all times relevant to this complaint.

206.    As alleged above, Mr. Postrollo lacked the training and/or supervision needed to adequately execute his duties under the disciplinary process mandated by the Handbook. His negligent and/or intentionally tortious acts caused injury to Plaintiff.

207.    The University knew, or in the exercise of reasonable care, should have known of Mr. Postrollo's lack of proper training and/or supervision required to execute their duties.

208.    The University's negligent failure to train and/or supervise Mr. Postrollo directly and foreseeably caused injury to Plaintiff, including by causing him not to take notes of Jane Roe's final round of testimony at the hearing, thereby impairing his ability to file an effective appeal.  Had the University taken appropriate steps to train and/or supervise Mr. Postrollo, such steps would, more likely than not, have prevented these injuries to Plaintiff.

209.    The Complaint Procedure also obligates the Dean(s) of Students to ensure committee members have received training in the Sexual Misconduct Policy and the Complaint Procedures.

210.    The Dean(s) had an obligation to ensure that Plaintiff's committee members received instruction on the Sexual Misconduct Policy's definition of "consent," and specifically on the fact that it defines consent as an "agreement," and not a desire.

211.    Because of their inadequate training of supervision, the committee understood "consent" to mean a desire, and not an agreement.

212.    The University's failure to properly train the committee members directly and foreseeably caused injury to Plaintiff, including by causing the committee to find that, despite her professed agreement to engage in sexual relations with Plaintiff, she must not have consented to those encounters because on some level she did not want to.

213.    The University gave Plaintiff notice of his committee hearing on May 14, the second day of final exams.

214.    The University scheduled Plaintiff's hearing to occur on May 27, after commencement, when most potential witnesses would be off campus.

215.    The University gave Plaintiff less than three full days to review the investigation file, prepare and submit written documentation, contact and secure the appearance of witnesses, and draft written summaries of their testimony.

216.    The University denied Plaintiff the assistance of an attorney in completing this task.

217.    The University failed to extend any of these deadlines to allow Plaintiff to adequately prepare, even though it has the authority to do so under Section V.2. of the Complaint Procedure.

218.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties, mischaracterized the truth, and facilitated a process that violated Plaintiff's rights and other protected interests.

219.    As a direct and proximate result of the University's negligence, carelessness, and breach of due care, Plaintiff will suffer financial losses, including but not limited to lost earning potential due to his inability to be admitted to graduate schools, or hired for positions, for which he was competitive before the disciplinary hearing but is no longer.

220.    As a further direct and proximate result of the University's negligence, carelessness and breach of due care, Plaintiff also has suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

221.    Accordingly, the University is liable to Plaintiff for negligence and for all damages arising therefrom.

## COUNT IV – NEGLIGENCE PER SE

222.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

223.   Upon information and belief, The College of St. Benedict and St. John's University receive federal funding, including in the form of federal student loans given to students.

224.   The Higher Education Act of 1965, as amended by the 2013 reauthorization of the Violence Against Women Act, states that both the accuser and the accused in campus disciplinary proceedings have the right "to be accompanied to any related meeting or proceeding by an advisor of their choice." 20 U.S.C. § 1092(f)(8)(B)(iv)(II).

225.   The draft regulations implementing that amendment expressly state that this right includes the right to have an attorney as one's advisor. *See* 79 Fed. Reg. 35445-46.

226.   The Complaint Procedure expressly limits a student's choice of advisor to members of the University's administration, faculty, or staff.

227.   By restricting Plaintiff's choice of advisor, the University carelessly, improperly, and negligently breached a duty it owed to Plaintiff.

228.   Plaintiff was directly and foreseeably harmed by the University's carelessness and negligence, in that the denial of the assistance of an attorney prevented him from effectively marshaling evidence and argument in his defense, evidence and argument that he was required to collect and construct on a compressed time schedule amid his academic commitments.

229.   As a direct and proximate result of the University's negligence, carelessness, and breach of due care, Plaintiff will suffer financial losses, including but not limited to lost earning

potential due to his inability to be admitted to graduate schools, or hired for positions, for which he was competitive before the disciplinary hearing but is no longer.

230.    As a further direct and proximate result of the University's negligence, carelessness and breach of due care, Plaintiff also has suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

231.    Accordingly, the University is liable to Plaintiff for negligence per se and for all damages arising therefrom.

## COUNT V – VIOLATION OF TITLE IX (20 U.S.C. § 1681)

232.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

233.    Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

234.    Upon information and belief, The College of St. Benedict and St. John's University receive federal funding, including in the form of federal student loans given to students.

235.    The procedural protections afforded respondents in sexual misconduct disciplinary proceedings are unfair and inadequate.

236.    Sexual misconduct complainants at the University may spend weeks, or even months, collecting evidence and constructing arguments before filing the complaint that initiates an investigation.  They have the ability to structure that process around their academic and extracurricular commitments.

237.    Sexual misconduct respondents at the University, by contrast, have as little as five, and as many as only ten, business days in which to review the documents in the investigative file, collect relevant evidence, and construct a defense.  They do not have the luxury of structuring that process around their academic or extracurricular commitments.

238.    Sexual misconduct violations are more likely than others to result in the most serious sanctions the University can impose.

239.    Claims of sexual misconduct, more often than other claims, are decided solely or primarily on the basis of the parties' credibility, because sexual contact typically takes place in private.

240.    This makes the assistance of lawyers, who are trained to examine testimony for inconsistencies and implausibilities, especially important in sexual misconduct disciplinary proceedings.  The University's refusal to allow sexual misconduct respondents the assistance of a lawyer is therefore a particularly egregious harm.

241.    Because sexual misconduct claims often turn on whether a complainant's overt acts reasonably communicated consent, such claims should be decided by committees composed of students, who, as the parties' peers, are best situated to make that determination.

242.    For those reasons, respondents in sexual misconduct cases are entitled to greater procedural protections and more time to prepare a defense than respondents in other cases, and further to a committee composed of their peers.

243.    Respondents at the University, however, are given no special procedural protections, are judged by a committee of administrators, and in fact are held to a higher appellate standard than respondents in other types of disciplinary proceedings.

244.    The vast majority of respondents in the University's sexual misconduct investigations and disciplinary proceedings are male.

245.    The University's inadequate investigative and adjudicative procedures therefore have a disparate impact upon male students.

246.    The University's inadequate and unfair hearing procedures directly and proximately prevented Plaintiff from mounting an effective defense to Jane Roe's complaint.

247.    Accordingly, the University is liable to Plaintiff for violation of Title IX, and for all damages arising out of that violation.

## COUNT VI – VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
### (M.S.A. § 363A.13)

248.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

249.    Section 363A.13(1) of the Minnesota Human Rights Act makes it unlawful "to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . sex."

250.    For the reasons stated in Count V, the procedural protections afforded respondents in sexual misconduct disciplinary proceedings are unfair and inadequate.

251.    The vast majority of respondents in the University's sexual misconduct investigations and disciplinary proceedings are male.

252.    The University's unfair investigative and hearing procedures therefore have a disparate impact upon male students.

253.    The University's inadequate and unfair hearing procedures directly and proximately prevented Plaintiff from mounting an effective defense to Jane Roe's complaint,

including by denying him (i.) adequate time to prepare a defense, and (ii.) the assistance of an attorney.

254.    Accordingly, the University is liable to Plaintiff for violation of the Minnesota Human Rights Act, and for all damages arising out of that violation.

### COUNT VII – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 *et seq.*) AND THE REHABILITATION ACT (29 U.S.C. § 701 *et seq.*)

255.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

256.    At all times relevant to this Complaint, Plaintiff was labeled a "Student at Risk" by the University.

257.    Upon information and belief, at all times relevant to this Complaint, Plaintiff was registered as disabled with the University.

258.    The University provided Plaintiff with various disability accommodations during the 2013-2014 academic year.

259.    Plaintiff received notice of the disciplinary investigation against him on the second day of final exams, two days before his last final exam.

260.    Plaintiff was never asked whether he needed an accommodation for his disciplinary hearing.

261.    Plaintiff's hearing was scheduled to occur on May 27, after commencement, when most students (and thus most potential witnesses) would be off-campus for the summer.

262.    Plaintiff was given fewer than three full days to review the investigation file, collect and prepare documentary evidence, select and secure the appearance of witnesses, and draft written summaries of their factual testimony.

263.   Because of his disability, Plaintiff's parents asked the Dean of Students that Plaintiff be allowed the assistance of an attorney at the hearing.  That request was denied.

264.   No administrator ever proposed an alternative reasonable accommodation to Plaintiff after the denial of his request that he be allowed to bring an attorney to the hearing.

265.   Plaintiff had a right to expect that, as someone with a registered disability, his hearing would be conducted in strict accordance with the procedures promised in the Complaint Procedure, and he had no duty to request "strict adherence to required procedures" as an accommodation.

266.   If given a reasonable accommodation, Plaintiff would have been able to adequately participate in a disciplinary hearing.

267.   By failing to strictly adhere to its promised procedures, and/or suggest alternative reasonable accommodations, the University failed reasonably to accommodate Plaintiff's disability.

268.   The University's failure to provide Plaintiff with reasonable accommodation regarding his hearing directly impeded Plaintiff's ability to provide a meaningful defense in at least the following ways:

a.   Denying him a hearing untainted by interference with process.

b.   Denying him a hearing in which the parties were treated equitably.

c.   Denying him an advisor of his choosing, and one free of bias.

d.   Denying him a hearing date free of the burden of impending final exams and other major academic commitments.

e.   Denying him adequate time to marshal witnesses in his defense.

269.    For all of these reasons, the University is liable to Plaintiff for violation of the Americans with Disabilities Act and the Rehabilitation Act, and all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against Defendants, and order relief against the Defendants as follows:

a.    That this Court issue preliminary and permanent injunctive relief restraining the College of St. Benedict and St. John's University (1) from continuing to enforce any punishment against Plaintiff, including by allowing him to enroll at the University for the fall semester, and (2) from making any notation on Plaintiff's transcript, or keeping any record related to this disciplinary hearing in Plaintiff's educational records, as its sanctions were the product of an erroneous finding that Plaintiff violated the Code, which was itself the product of a flawed disciplinary process.

b.    That St. John's University be ordered to pay compensatory damages as appropriate to compensate Plaintiff for his losses caused by the University's misconduct, in the amount of $1,000,000; and

c.    That St. John's University be ordered to pay punitive damages, in the amount of $2,000,000; and

d.    That this Court award Plaintiff his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues herein presented.

Respectfully submitted,

*/s/ Peter J. Diessner*
Peter J. Diessner (MN Bar No. 388295)
SPEETER & JOHNSON
1515 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN 55402
(612) 339-7566
(612) 339-9055 (Facsimile)
pdiessner@speeterjohnson.com


*/s/ Christopher C. Muha*
Christopher C. Muha (D.C. Bar No. 987116)
*Pro Hac Vice application pending*
Justin Dillon (D.C. Bar No. 502322)
*Pro Hac Vice application pending*
THE KAISER LAW FIRM PLLC
1400 Eye Street NW
Suite 525
Washington, DC 20005
(202) 640-2850
(202) 280-1034 (Facsimile)
cmuha@tklf.com
jdillon@tklf.com


*Attorneys for Plaintiff*

DATED:  August 4, 2014